IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **United States of America,** | Case No. 1:19-cr-38 |
| Plaintiff, | Judge John R. Adams |
| v. | |
| **Arnita Leff**, | **Sentencing Memorandum of Defendant Arnita Leff** |
| Defendant. | |

We respectfully submit this Sentencing Memorandum on behalf of Arnita "Nita" Leff in support of a sentence "sufficient, but not greater than necessary" to achieve the statutory purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2). 18 U.S.C. § 3553(a). This memorandum, and the numerous letters of support attached as exhibits, provide a fuller account of Nita's crime and also the broader context of a remarkable life well-lived, which has resulted in much good for a wide variety of people. While, as with any crime, a certain degree of punishment must be imposed, the sentence must reflect the unique circumstances of this offense, which, though wrong indeed, was far more virtuous than the average healthcare-fraud case. It should also afford significant consideration to the very positive history and characteristics of Nita. *See Pepper v. United States*, 562 U.S. 476, 488 (2011) ("In particular, we have emphasized that highly relevant—if not essential—to the selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics.") (internal quotation marks and alterations omitted).

We respectfully submit that a sentence of probation is the appropriate sentence for Nita. Any period of incarceration would be greater than necessary and, frankly, a waste of public resources, for this sixty-six-year-old woman who has spent her entire life helping others, has never before been in trouble with the law, has significant health issues, has

suffered substantial humiliation, will suffer serious professional licensing ramifications, and has made earnest and meaningful contributions toward restitution.

## PRELIMINARY STATEMENT

There are many ways a person may be able to justify, to themselves, doing something they know is not allowed, or giving a trusted friend the benefit of the doubt under circumstances where most people would realize something was amiss. The Court will appreciate in its significant experience that many people who commit white-collar crimes are driven by personal greed, a lavish appetite, or a hunger for power, which causes them to abandon their moral compass and take advantage of others for their own benefit. This is not such a case. While there is never an excuse for criminal conduct, there is perhaps no better subjective reason for it than Nita's reason—a misguided attempt to help women and children who are at the fringes of society.

As is apparent to everyone who knows Nita well, she is a caring person driven by a need to help others. She spent her career helping others as a licensed social worker and as a career counselor, especially women who, for one reason or another, found it difficult to right their lives and secure meaningful employment. This drive continued to motivate her when she opened her own business.

Nita and her business partner Carol Kwait tried to set up Partners to Empowerment ("Partners") correctly to provide counseling and other skill-building services to the underserved, even securing a Licensed Independent Social Worker (Sarah "Sally" Iannone) and an experienced Medicaid biller (Angela Meeks). However, things went awry in practice. When things went awry, Nita and Carol, her business partner, allowed Partners to continue billing Medicaid even though they knew or should have known they were not in compliance with Medicaid regulations. This was a serious mistake—and frankly, an anomaly of Nita's character and life well-lived—that brings Nita great shame, emotional stress, and embarrassment. At the time, she justified her actions in her mind because the money from Medicaid was allowing Partners to continue providing services that were helping the

underserved, including women battling addiction and at-risk children with little access to beneficial programming. As she says, she did not want to "leave those people out to dry." Nita realizes this is no excuse for her actions. But it does provide important context and we respectfully submit this was not the kind of self-interested motivation that calls for imprisonment.[1]

As the numerous letters of support attached to this memorandum attest, Nita's errors of judgment were an aberration in an otherwise exemplary life. Nita is an excellent therapist, a caring sister and friend, and a doting mother who raised two capable women, one of whom followed Nita into the field of social work. Her supporters stand behind her notwithstanding this case. Her supporters also all universally recognize that Nita has changed noticeably as a result of this case; she has become withdrawn and depressed, no longer exhibiting the joy and enthusiasm that was a hallmark of her personality. Nita's brother, an attorney in Florida, stated well what many other supporters echo in their letters:

> [Nita] also has suffered terribly on an emotional level. She has cried endlessly, re-examined all of her actions and inactions, prayed for forgiveness, and now has taken responsibility for her circumstances. With my heart and best judgment, I believe that Nita will never be in this kind of situation again for the rest of her life and hereafter will be once again a thankful and good, positive contributor to society.

(Letter of brother Kevin Cowan, Ex. A, p. 9.)

Nita has been punishing herself to an extent not often seen. She is extremely remorseful, she has chosen not to renew her license to practice social work[2], and she has made every effort to pay as much as she can back as restitution. We respectfully submit that this is not an offense that calls for imprisonment, and this woman does not deserve it. A sentence of probation with conditions as the Court in its judgment sees fit, including

---

[1] Indeed, shortly before the Indictment, the government indicated to previous defense counsel that it had not yet decided whether to resolve this case civilly or criminally.

[2] Defense counsel has consulted with the Ohio Counselor, Social Worker and Marriage and Family Therapist Board (the "Social Worker Board") regarding this matter. We expect the Social Worker Board will initiate disciplinary action against Nita following the entry of judgment in this case. Therefore, expecting her license to be revoked, Nita has effectively voluntarily surrendered it by failing to renew it.

perhaps a reasonable period of home confinement and significant community service re-quirement, is sufficient and appropriate in light of the factors set forth in 18 U.S.C. § 3553(a).

## THE 3553(a) FACTORS WARRANT
## A PROBATIONARY SENTENCE

The Sixth Circuit has set forth a procedure for post-*Booker* sentencing. Once the appropriate advisory Guideline range is calculated, "the district court throws this ingredient into the section 3553(a) mix" taking into account all of the other factors listed in 18 U.S.C. § 3553(a). *United States v. Collington*, 461 F.3d 805, 807 (6th Cir. 2006) (citation omitted). Taking into account all of these factors, the Court must tailor a sentence to be just enough—but not too much—to accomplish the goals of sentenc-ing in light of all the characteristics of the individual standing before them and the specific circumstances of the crime they committed. *See* 18 U.S.C. § 3553(a); *Pepper v. United States*, 562 U.S. 476, 487 (2011) (noting that sentencing judges "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue") (citation omitted).

Because every sentence must be individually tailored, a sentencing court may not presume that the Guidelines range is reasonable. *See, e.g.*, *Gall v. United States*, 552 U.S. 38, 50 (2007) (citation omitted). The Supreme Court also rejected appellate rules requiring "extraordinary circumstances" to justify a variance and the "the use of a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence." *Id.* at 47. One reason for this rejection seems to be that the Supreme Court recognized that those rules discouraged giving a deserving defendant a probationary sentence. *Id.* at 47–48 (recognizing that probation was always a "100% departure" from a Guidelines

range recommending imprisonment and that the Guidelines gave "no weight" to the "substantial restriction of freedom" involved in a term of probation).

Evaluating the factors set forth in 18 U.S.C. § 3553(a), in light of Nita's history and characteristics, the particular context of her offense, her sincere efforts to make her mistakes right, and the other circumstances unique to this case, establishes that a sentence of probation, with conditions as the Court deems appropriate, will fulfill the statutory mandate and be the just result for Nita.

## I.  The nature and circumstances of this offense and the history and characteristics of Nita Leff strongly favor a probationary sentence. [§ 3553(a)(1)]

### Nita Leff

*Nita as a sister, daughter, granddaughter, and friend*

Nita Leff is 66 years old. She has ***never*** before been in trouble with the law.[3] In many ways, she has been the model of a fundamentally good person, actively helping her community and family at every opportunity while raising two capable daughters. The attached letters echo the same refrain:

> "When I think about my Mom, I remember her first and foremost being a woman of service, integrity and a leader. . . . She has always wanted to help her community and empower others, that has always been her driving force. Growing up, the lessons she taught me were about everyone's right to having a good life, never judging anyone, helping lift those who struggled, and trusting in God and the universe." (Letter of daughter Alexandra Leff, Ex. A, p. 1.)

> "I have always known [Nita] to be an honest, intelligent, and hard working person. She has been a person I could count on, confide in, and trust. Nita has been devoted to helping her children and has a good relationship with her husband Seymore Ellis. . . . She always appeared

---

[3] It is the rare defendant that can proudly note that their criminal history reflects not even a traffic ticket. Such a laudable history of living within the bounds of society's rules is worth considerable weight, on the defendant's side of the scale, when determining what punishment a defendant needs in order to satisfy their debt to our society. Indeed, courts have noted that even individuals with a minor criminal history can be in Criminal History Category I, and therefore it is proper and not redundant for a court to consider a complete lack of criminal history to be an additional mitigating factor. *See United States v. Autery*, 555 F.3d 864, 874 (9th Cir. 2009).

to be a very conscientious therapist." (Letter of neighbor and friend Dr. Deborah Ross, Ex. A, p. 21.)

"This is a person that had a lifetime of good deeds and doing the right things. She was always the 'social worker' getting involved when she could and helping out whomever when she could." (Letter of brother Robert "Peter" Cowan, Ex. A, p. 13.)

Nita was born and raised in Dayton, Ohio. Her close-knit family resided in an upper-middle-class Jewish neighborhood. Her father passed away when she was six years old, barely old enough to have any concrete memories of him. Her mother had to take over her father's business, and as Nita grew up, she naturally took it upon herself to help the family while her mother worked. Her siblings recount how Nita was always helping her grandmother, who was partially crippled, and how Nita made sure chores were done in order to minimize household stress for her mother when she got home from work. (Letters of brother Robert Cowan and sister Karen Meyer, Exs. A, pp. 6–7, 13.)  Her mother re-married when Nita was 13 years old, but her stepfather passed away a short time later. Naturally empathetic and intuitive, her family, friends, and patients all describe how Nita—throughout her life—has always had a knack for picking up on people's emotions and a drive and passion to help people when she felt she could. From sitting with a lonely neighbor as a child (Letter of sister Karen Meyer, Ex. A, pp. 6–7) to helping her siblings throughout their lives when difficult circumstances arose (*e.g.*, a loss of a child for sister Karen Meyer, Ex. A, pp. 6–7; the unique challenges of an adoption for brother-in-law Darrell Young, Ex. A, pp. 4–5), Nita always played the role of the supporter, the nurturer.

Nita's role in the family as helper led her to develop an especially close relationship with her mother. Her siblings express gratitude for Nita's central role in taking care of their mother as she grew older, even though Nita ended up in Cleveland and her mother and most of her siblings ended up in Florida. (Letters from siblings, Ex. A, pp. 4–13.) Nita talked with her mom almost every day and visited often. From Cleveland, Nita researched, interviewed, and set up a companion in Florida to visit her mom every day when her mom needed extra help. Not only did Nita take on this responsibility for her own mother, but

she also handled the arrangements and affairs of two of her mother's sisters when they needed caregiving. (Letter of brother Robert Cowan, Ex. A, p. 13.) Nita's mother passed away last year, shortly before the Indictment, at the age of 100.

Because of the caring and hard-working nature she exhibited as a child, it was no surprise to anyone who knew "little Nita" that she chose social work as a profession. (*E.g.*, *id.*) She earned her bachelor's degree from The Ohio State University and her license to practice social work. While working, raising two small children, and going through a divorce in the 1980s, Nita put herself through night school at Cleveland State University and earned her Master's Degree in counseling (L.S.W., M.Ed.).

*Nita as a social worker*

No one goes into social work to get rich. People become social workers to help others. But even among social workers, Nita stood out for her dedication to underserved populations and her determination to do anything in her power to help those who needed it. Her first job out of social-work school at The Ohio State University was at a nursing home, which is not surprising considering Nita's adolescent disposition toward the elderly. (*See* Letter of daughter Danielle Leff, Ex. A, p. 3 ("She entered the field of social work initially to build on the strong connections she had to her grandmother and elderly relatives.")) She served the elderly at the nursing home for five years before leaving for private practice. For the next four decades, Nita circulated between private practice and organizations in roles directly related to helping underserved populations.

As a private therapist, Nita's clients credit her with being the absolute right person at the right time when the clients were going through a challenging time in their lives. (*See* Letters of clients Gina Tyhulski and Deborah & Gary Morse, Ex. A, pp. 23–26.) Indeed, it is difficult to overstate the affection that Nita's clients have for her. They have, quite literally, credited her with saving them:

> From the first day I met Nita, my life began to change. . . . **Nita saved me.** Without a doubt my life would be so different had I not met her. She has made the most profound difference not only in my life, but also on my life

and continues to this day. She has gone above and beyond her job as a therapist.

(Letter of client Gina Tyhulski, Ex. A, p. 24–26) (emphasis added).

> Nita kept us from making some serious life errors, and **our lives are better because of her.** We have found Nita to be humorous, honest, insightful, caring, and very professional. She is empathetic without being indulgent. Nita would give us the space and time to speak freely. But would always challenge us to get beyond our self-protecting emotions and see our issues clearly, without judgment.

(Letter of clients Deborah and Gary Morse, Ex. A, p. 23.)

Nita not only has the support of her clients, but other mental-health professionals have also written in support of her and have attested to her character and competence as a therapist in private practice. (Letter of Dr. Deborah Ross, Ex. A, p. 21) ("She always appeared to be a very conscientious therapist . . . She worked with people in her practice that had very little resources and often very difficult problems such as addictions.") Dr. Mark McConville, who has seen Nita for therapy from time to time over the past ten years, writes eloquently:

> There are several things I can say with confidence concerning Nita, having known her in the context of psychotherapy over the course of nearly ten years: she is a deeply committed parent;  professionally, she is motivated by a genuine desire to support troubled women; and while she may indeed be guilty of sloppiness and inattention to detail, she does not have a criminal bone in her body.  **I had considerable experience working with clients who ran afoul of the law earlier in my 40 year career, and can state unequivocally that Nita shares none of the personality, motivational, or emotional characteristics of that population.**

(Letter of Dr. Mark McConville, Ex. A, p. 22.)

In addition to improving the lives of her private therapy clients, Nita has improved the lives of many more through her exemplary career and work history. Nita interned at a life-skill and career-development program for Cuyahoga County Community College's ("Tri-C") Displaced Homemakers Program, serving around 80 women every year who were widowed, divorced, living with a disabled family member, or leaving abusive relationships. In that role, she created the first speaker's bureau, enhancing client awareness

of life-management issues. She also taught the women tools for personal development, career exploration, self-esteem building and goal setting.

Nita also worked almost a decade for the Jewish Family Service Association ("JFSA") as the Career Services Program Manager/Counselor. As program manager, she assisted 350–400 individuals per year with determining long- and short-term employment goals, analyzing job histories and identifying strengths, values, and interests in order to help the individual find meaningful, empowering work. She also facilitated support groups for individuals and families and conducted workshops and provided crisis intervention for clients with psychosocial or mental-health issues.

After JFSA, Nita was recruited back to Tri-C to be the director of the Women in Transition Program on all three Tri-C campuses. In that position, she was responsible for the leadership and direction of the grant-funded program, including coordinating all services, developing workshops for the women, and supervising program staff at all three campuses. She also created and implemented an evening program for the women. The program served over 450 women a year, with over 85% of women ultimately pursuing degrees or certificates after graduating from the program under Nita's directorship. Clearly, Nita has devoted her life and career to helping others, and our community—through the many lives she touched—is better because of Nita. This weighs heavily in favor of a sentence that affords her the opportunity to remain in society—not incarcerated.

Even while working as a private therapist and at these organizations, Nita made the time to help her family and personal friends when challenges confronted them in their own lives.

> As a teenager struggling with substance abuse and depression, my Mom fought to keep me on the right path and collaborated with my teachers and acting mentors to get me involved in theater after I quit, which **ultimately not only saved my life, but also gave me my purpose back**. . . . When I moved to New York and got my Master's, I got sick with an Eating Disorder; my Mom dropped everything to fly me to a treatment center in California and make sure I stayed as long as I needed and ultimately got well. She supported me in my own healing and recovery. As a result, I now get to support women on the same journey.

(Letter of daughter Alexandra Leff, Ex. A, p. 1) (emphasis added).

> Nita helped me tremendously when my daughter died.

(Letter of sister Karen Meyer, Ex. A, p. 6.)

> [Nita] has helped many, many people in her practice and has helped me personally on a number of occasions with good, clear insights into my life. I believe Nita has a very positive effect on those around her.

(Letter of brother Kevin Cowan, Ex. A, p. 8.)

> Nita was supportive of me in my time of need when I was going through a difficult time with my partner. She provided guidance and support as a friend and as a therapist and helped us get back together. **We are still together 15 years later in a very strong and healthy relationship thanks to Nita.**

(Letter of longtime friend Nancy Levine, Ex. A, p. 18) (emphasis added).

> Over the past few years, my dad's health has not been ideal. I have had a lot of personal challenges to deal with to support my mom and dad from afar. Nita consistently was there when I needed; to be an ear to listen to, someone to offer up advice and sharing learning from her experiences.

(Letter of longtime friend Rhonda Kruman, Ex. A, p. 20.)

> Over the years Nita has continued to be a large and important part of our family. We have shared all our life cycle events together; both the special ones and the more difficult ones. **Her counseling training has been so helpful and important getting us all through the more difficult times.**

(Letter of brother-in-law Darrell Young, Ex. A, p. 4) (emphasis added).

Nita was a professional supporter, both to her clients and to her family and friends. But as all those who know her attest, she was not interested in getting wealthy or living lavishly. She was driven primarily by a need to help.

> [Nita] never cared about "status" or expensive things. She was not money driven, just full of compassion and the *need* to help.

 (Letter of sister Karen Meyer, Ex. A, p. 6.)

> Nita Leff consistently put herself last, as her adoration, selflessness, and love of caring for her friends and family completely come first.

(Letter of longtime friend Judith Waxman, Ex. A, p. 17.)

> [S]cheming and greed is just not part of her make up.

(Letter of brother Kevin Cowan, Ex. A, p. 8.)

> **[Mom] was not a fancy lady and didn't care about materialism or keeping up with the Jones'.**

(Letter of daughter Alexandra Leff, Ex. A, p. 1) (emphasis added).

> Nita has never been a materialistic person. She is somewhat of a minimalist and is happy with a simple lifestyle.

(Letter of Dr. Deborah Ross, Ex. A, p. 21.)

She often took phone calls and met with clients without charging or was flexible about when clients paid for services. (*E.g.*, Letter of patient Gina Tyhulski, Ex. A, p. 25) ("She continued to help through hard times, when the money just wasn't there. Countless unexpected phone calls to check up on us.").

Nita was a social worker, both professionally and in her personal relationships. By her hard-working, helpful, and caring nature, she became a central part of her family and she built and maintained numerous long-term relationships. Being a social worker was an enormous part of her identity, both to others and to herself. She is devastated that her errors in judgment, which led to this case, will forever be a blot on that career. While from speaking to her family and former patients it seems unlikely that Nita will be blemished in their eyes, for Nita, this case has been an earthquake, cracking and threatening to reduce to rubble the respect and love she had had for herself. This case has caused Nita to voluntarily not renew her license because it is likely inevitable she would lose it anyway. She is embarrassed to go outside her apartment, cancels appointments routinely because she does not want to face her friends, and constantly worries about whether she will ever recover. The stress and shame of this case has taken an incredible toll on her health, both physically and mentally.

*Nita as an older adult with significant health problems*

Nita is now 66 years old and, unfortunately, she has several significant medical problems. Among a number of managed conditions consistent with her age, three medical

situations are especially serious: accelerated spinal degeneration; chronic obstructive pulmonary disease ("COPD"); and heart problems, possibly causing losses of consciousness.[4]

Nita has osteoporosis and degenerative disc disease and her spine is degenerating—quickly. For years, she had been receiving Forteo injections every day to help slow and manage the condition. This past year, the Forteo was replaced with twice-yearly Prolia injections. A short time after the change of plea in this case, on 2 July 2019, Nita experienced extremely painful back spasms that caused her to see her spinal doctor at the Cleveland Clinic. X-rays revealed new spinal fractures, and her doctor expressed concern about the speed of the degeneration. As a result of these back problems, Nita has severe chronic pain in her back almost all the time. She has significant mobility trouble and often cannot sit or stand for very long without having to lay down in bed or lay on the floor and stretch her back. Indeed, defense counsel have been meeting with Nita in her home because she has difficulty traveling. The presentence interview also had to take place in her home, which Probation Officer Chris Woo was considerate enough to accommodate.

Nita is a candidate for spine surgery, but she has not yet decided to undergo the significant procedure because her brother Kevin had a similar surgery and it did not seem to help with, and perhaps even caused a worsening of, his own similar spine condition. Nita's back pain and mobility limitations strongly counsel against imprisonment. In prison, Nita would be required to be on her feet for significant periods of the day, including walking across the campus to do simple things like eat or use the restroom facilities.

Nita has had asthma for a long time and has struggled with COPD for several years. She has had several breathing episodes during the pendency of this case, and even went to the emergency room for pneumonia shortly after the presentence interview in this case. She has to do daily breathing treatments to maintain her lung function.

---

[4] Because the probation office has confirmed the details of Nita's health conditions in the presentence report (PSR, Sealed Doc. 42, ¶ 50) from records provided by Nita during the investigation, the medical records are not re-attached here. If it would aid the Court in considering this matter, the defense could file medical records under seal documenting Nita's health situation.

With regard to Nita's heart, two of her arteries are 50% blocked and she has an enlarged left ventricle. More concerningly, she has experienced fainting spells this year. On at least one occasion, a fainting spell left her face bruised after she hit her face on the floor. Her cardiologist has not been able to determine what is causing the fainting, but Nita is to follow up with him in a few weeks.

With these health conditions, imprisonment would be disproportionately severe on Nita. She would have less control over her environment, which could have an impact on her breathing health (for example, she may be required to walk outside during the winter or when allergens are at a peak). She would have less control over her medical appointments and fewer options when it comes to medication.[5] She could very well be physically uncomfortable or in pain every day.

Moreover, imprisonment would be the farthest thing from "provid[ing] the defendant with needed . . . medical care . . . in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). The Bureau of Prisons spends over a billion taxpayer dollars on inmate health care alone every single year, a number that has ballooned 37% since 2009. U.S. GOVERNMENT ACCOUNTABILITY OFFICE, BETTER PLANNING AND EVALUATION NEEDED TO UNDERSTAND AND CONTROL RISING INMATE HEALTH CARE COSTS at Executive Summary (June 2017), https://www.gao.gov/assets/690/685544.pdf [bit.ly/BOPhealthcare].

The BOP has cited an aging inmate population and rising costs of outside medical services as two primary factors accounting for its overall health care costs. *Id.* at p. 2. Imprisoning someone like Nita, who is 66 years old and requires frequent medical appointments—likely appointments that would have to be handled at outside medical facilities—would only add to the rising costs to taxpayers for federal inmate health care. Conversely, Nita and her husband could continue arranging and covering her own health care

---

[5] Nita's extensive list of prescribed medications is set forth in the presentence investigation reports. (First PSR, Sealed Doc. 38, ¶ 51 (except now Flexerel, recently stopped); Final PSR, Sealed Doc. 42, ¶ 51).

if allowed to remain in the community. While serious health conditions may not be a sufficient reason not to incarcerate someone who deserves it, courts have considered serious health conditions, among a variety of factors, to support a downward variance. *E.g.*, *United States v. Dodson*, 519 F. App'x 344, 347, 353 (6th Cir. 2013) (noting that district court varied down 24 months because of the defendant's "poor health and advanced age (70 at the time of sentencing)," and affirming sentence); *United States v. Kinzer*, 365 F. App'x 646, 647, 649–50 (6th Cir. 2010) (noting that the district court varied down 27 months because of the defendant's age and health, and affirming sentence).

### The Offense Conduct

Nita's life of service as a social worker and her experience leading programs like the Women in Transition Program led her to a frightening but exciting thought in 2015— maybe she could start her own business, empowering clientele with therapy, but also with general wellness tools to promote their health through self-care. Nita discussed the possibility with a woman she had worked with at Tri-C and with whom she was especially close: Carol Kwait. Nita remembers one evening where she and Carol sat in Nita's car in the pouring rain, talking about what such a private venture would look like. They both recognized that they would need help, that it was risky, and that they did not know the first thing about running their own business. Carol turned to Nita, rain slamming the windshield around them, and said what they were both thinking:

"We can do this."

Nita and Carol knew that part of their business would depend on payments from Medicaid, because they wanted to continue providing counseling and wellness services to underserved and impoverished people. They did their best to set up Partners the right way. They arranged for a Licensed Independent Social Worker ("LISW"), Sarah "Sally" Iannone, to supervise the counseling work. And they hired Angela Meeks, who Nita and Carol worked with for years at JFSA and who they knew had 35 years of experience billing

Medicaid. These actions are not the kind of actions one would take if one were intending to commit fraud or set up a scam. To the contrary, these actions show that Nita and Carol were trying to do things the right way.

With these pieces in place—and without knowing enough themselves to adequately supervise the billing—Nita and Carol started providing services and submitting bills to Medicaid. An attorney with whom Carol and Nita worked during the later Caresource audit would eventually describe the situation to defense counsel as being akin to "three kids playing with a chemistry set." They simply were not equipped to handle the extremely nuanced and complicated but extremely important responsibility of billing the American taxpayers for mental-health services. But at the time, they thought they had assembled the right pieces to be in compliance.

Partners provided services to underserved populations through several organizations—David's Challenge (at-risk children); Hitchcock Center for Women (women in recovery from addiction); Northern Ohio Recovery Association (men and women in recovery from addiction), and Oriana House (men and women struggling with addiction). The programs consisted of a combination of group counseling, workshops designed to teach coping skills, and therapeutic yoga and dance to build resilience and mindfulness. By all accounts, the services were very beneficial to the individuals who were fortunate enough to receive them:

> While at Partners [t]o Empowerment, I had the opportunity to work with the residents at NORA and Hitchcock House. I would go to NORA once a week with Nita or her partner as support. I would lead the residents in either chair yoga or a gentle yoga class, as well as, teaching them mindfulness techniques to help them cope with any struggles that may arise once they left the monitored living situation and were back on the their own. These mainly involved breathing exercises, meditation or other relaxation techniques. The idea is that if something comes up that is a trigger for the person, something that could lead them back to drug use or a past behavior that could get them in trouble, they could use one of these tools to get them through that moment. As for the participants, lots of times at first, they were hesitant or resistant to what I was trying to show them. Usually as the weeks went on, many would find that it did help them or would even tell us about how they used one of the techniques when they couldn't fall asleep or there [were] disagreements with other residents and how it helped them.

— 15 —

> **Of course, there's no one answer to help everyone, but I certainly would see the positive effects for many over time.**

(Letter of former Partners contractor Marcia Hudgel, Ex. A, p. 29) (emphasis added).

Another former Partners contractor, Sha'Ran Marshall, describes how she provided dance activities to the children of East Cleveland at David's Challenge. (Letter of former Partners contractor Sha'Ran Marshall, Ex. A, p. 31.) "Being a minority myself, I was excited that I was asked to take on the opportunity to give back to the children of East Cleveland," she writes. (*Id.*) "PTE, as a whole, was about Wellness, and giving the opportunity for women, men, and children to move, is the best way to give back. . . . I applaud and give much respect to those who are willing to provide any assistance in bettering our youth, because they are our future, and in this instance, inner city children, miss out on a lot of opportunities to be better." (*Id.*)

Billie Gilliam, the director of NORA when Partners provided services there, told a defense investigator that there came a point where NORA could no longer afford to have Partners provide services because NORA was not able to bill for that time. But after Partners stopped, NORA would still refer patients to Partners for services because Partners' sessions benefitted the patients both at NORA and at Partners.

After Partners started providing these services, Nita and Carol tried to meet with Sally Iannone to go over what they were doing at these classes. But Iannone would cancel appointments or would not be available. This dynamic was confirmed by a former Partners employee who heard Nita and Carol complain about Iannone not being willing to supervise them as much as they needed.[6] (*See* Leah Dicker Aff., Ex. A, p. 27.) Iannone continued to collect $150 a month, essentially selling her name and license to Partners without doing anything for them.

---

[6] Ms. Dicker was never interviewed by the Government. (*See* Leah Dicker Aff., Ex. A. p. 27.)

There came a point where frustration with Iannone should have turned into a decision that her failure was unacceptable. Nita and Carol knew that without Iannone's supervision, they could not bill Medicaid for the therapy sessions they were providing. They knew that Iannone was refusing to supervise them. When it became clear that Iannone was hopeless as a supervisor, Nita and Carol had a choice. They should have stopped providing services immediately while they worked to secure a new supervisor. But instead, not wanting to leave the clients in the lurch and justifying to themselves that the work they were doing was good, helpful, virtuous work, they made a choice to continue the programs and to continue billing Medicaid as if Iannone were supervising them appropriately. Nita is incredibly ashamed of that choice, which not only set her on the path to be standing in front of this Court, but which ruined her career, tarnished her reputation, and wreaked havoc on her own mental health and the relationships she spent all her life building and nourishing.

In addition to allowing Partners to bill as if Iannone were supervising them, Nita eventually came to realize that her long-time friend Angela Meeks had taken advantage of Nita and the complete autonomy that Nita and Carol had given her when it came to the billing. Angela was billing codes that led to a higher payout than the appropriate code and had told Nita that certain billing procedures were appropriate when they were not. This included purporting that services had been provided to parents of the children at David's Challenge, when really services were provided to the children. In hindsight, Nita recognizes that she and Carol put a lot of pressure on Angela to get bills paid faster. They incentivized her by tying her compensation directly to the amount she was able to bill. And they failed to adequately supervise her or check her work. They trusted her, to a fault. Nita recognizes that they should have been more on top of Angela and taken more responsibility for the bills that their business was submitting.

Angela was the only person whose compensation was tied directly to the fraud. The more Angela billed, the more Angela was paid. Nita, on the other hand, took a modest net salary from Partners that was not tied directly to Medicaid billing: $17,887 in 2014;

$75,906 in 2015; and $70,198 in 2016. (Forms 1040, Ex. B.) She took a loss on the business in 2017. (*Id.*) Nita certainly did not get rich through these actions. She earned only a small fraction of the $661,010.91 loss amount, which she—and only she—is now obligated to repay. She reported and paid all applicable taxes on all monies earned.

A Medicaid investigation into Partners' billings was opened in 2017, with Sally as the named focus. The Medicaid investigation eventually turned into a probe by the U.S. Attorney's Office, which investigated the case both civilly and criminally. Despite the fact that Sally Iannone collected $150/month for years while doing absolutely no work for Partners, and despite the fact that Nita and Carol were complete partners in the business who discussed Sally's lack of supervision together, the Government made the decision to charge only Angela Meeks and Nita with crimes. The Government's explanation for the decision seems to be the result of having concerns about its ability to prove Iannone's and Carol's guilt beyond a reasonable doubt, not with concerns about whether they have criminal culpability in the first place.

Whatever the reason for the Government's decision, out of four women responsible for the false billing, only one is being held responsible in any way—Nita. Angela Meeks passed away before sentencing, leaving Nita the only person who will be punished. She will be the only one who will be a felon. She will be the only one who will have to pay restitution. She will be the only one under any criminal-justice sentence. Sadly, and ironically, Nita is the only person who has made any effort to make these mistakes right— she will have paid as much as she could toward restitution—and Nita is the only one who, years from now, will still bear the scars from this case. On the other hand, Carol continues to operate Partners to this day. If Nita is given probation, she will be checking in with her probation officer years from now and scraping together as much as she can to meet any payment schedule established for restitution, while Carol continues making money from the business that Nita helped build and whose success is based, at least in part, on this false billing. During the Caresouce audit, it was Nita who demanded that Partners stop providing services. When Carol refused to stop, Nita left the business. While the

Government's charging decision does not make Nita innocent, it has led to serious inequities that are relevant to what the appropriate sentence is for Nita. Probation for Nita is appropriate because, in addition to all the other reasons set forth herein, any period of incarceration would only serve to magnify these inequities. This would be a very unjust result.

On 2 July 2019, Nita Leff pleaded guilty to a single count of conspiracy to commit health care fraud (18 U.S.C. § 1349) pursuant to a plea agreement. The parties have agreed that the total offense level under the U.S. Sentencing Guidelines is 17 by virtue of the loss amount, but the Government did not insist on Nita agreeing to recommend a sentence within the corresponding Guidelines range for that level. U.S. Probation and Pretrial Services agreed that the appropriate offense level was 17, but also identified possible grounds for a downward variance, namely, the very positive history and characteristics of Nita. (PSR, Sealed Doc. 42, ¶¶ 38, 91.)

### Nita's Acceptance of Responsibility and Sincere Efforts to Make Amends

From the beginning of our involvement in the matter, Nita worked with the Government to reach a plea resolution. She timely pleaded guilty. She knows that her conduct was wrong, though well-intentioned, and initially set up appropriately. She has made sincere efforts to make her mistakes right, and she will have already paid at least $107,000 toward restitution by the time of sentencing.[7] All of these facts weigh in favor of a probationary sentence. *See United States v. Demonte*, 25 F.3d 343, 355 (6th Cir. 1994) (holding

---

[7] Nita is in a difficult position. She is 66 years old and has given up her ability to practice her profession as a result of this case. Her physical health problems would make working again very difficult or impossible. But the women in her family often live to be around 100 years old, meaning that she likely has a significant portion of her life left. She has some assets, but she is very concerned about her ability to support herself for the remainder of her life. This would be especially difficult if her husband were to pass away, as their assets are completely separate. Nita has tried to pay as much of the restitution as she felt she could without sacrificing her ability to care for herself in her old age, a responsibility which would then fall on her family. She fully expects to continue paying restitution according to a reasonable payment plan, which will be easier to meet if she were on probation because her monthly Government income may be limited or stopped if she were incarcerated.

that restitution payments may constitute "exceptional circumstances" that justify a downward departure); *United States v. Tilga*, No. CR 09-0865 JB, 2012 WL 1192526 at *4 (D.N.M. 2012) ("[T]he amount of restitution . . . warrants some variance.").

## II. The statutory purposes of sentencing are best served by a probationary sentence, which is an available sentence. [§ 3553(a)(2)–(3)]

A noncustodial sentence of probation is "sufficient, but not greater than necessary," to fulfill the statutory purposes of sentencing:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a), (a)(2).

Healthcare-fraud offenses are, in general, serious offenses. But they are nonviolent offenses and Congress has acknowledged that not every such offense requires a period of incarceration. *See* 18 U.S.C. §§ 1349, 1347 (incarceration not mandatory); *United States v. Husein*, 478 F.3d 318, 332 (6th Cir. 2007) (where a statute does not mandate imprisonment, "Congress thus not only envisioned, but accepted, the possibility that some defendants found guilty . . . would receive no jail time at all"). Congress has left the Court with broad discretion to craft a tailored sentence that can reflect the nature of this offense—which was driven by compassion and a desire to help others (although misguided)—and the history and characteristics of Nita, including her lifetime of service and abiding by the law, while still promoting respect for the law. *See id.* at 333 ("The extent of a downward departure or variance, in other words, should bear an inversely proportional relationship to the 'evilness' of the crime, and criminal, at issue."). Indeed, the Sixth Circuit has stated that where the Guidelines are driven primarily by loss amount, as they are here, "it is particularly appropriate for variances." *United States v. Musgrave*, 647 F.

App'x 529, 538 (2016) ("[T]here is reason to believe that, because the loss Guidelines were not developed using an empirical approach based on data about past sentencing practices, it is particularly appropriate for variances.") (citing MARK H. ALLENBAUGH, DRAWN FROM NOWHERE: A REVIEW OF THE U.S. SENTENCING COMMISSION'S WHITE–COLLAR SENTENCING GUIDELINES AND LOSS DATA, 26 Fed. Sent'g Rep. 19, 19 (2013) ("[T]he data suggest that loss is an unsound measure of the seriousness of many offenses, with the result that judges are increasingly willing to go below the Guidelines when they impose sentences in white-collar cases."). Moreover, even the loss amount here overstates the seriousness of this crime. The loss amount includes all claims Partners submitted to Medicaid for the entire time period of the business. While that is legally appropriate under the Guidelines, this case is much less severe than the loss amount would indicate because it includes claims submitted during the initial time period, before it was apparent that Iannone was not supervising them properly, and it also does not account at all for the difference between the lower group rate and the higher individual rate Angela Meeks was using.[8]

Nita poses absolutely no risk to the public. Her age and the fact that this is her first and only offense suggests she will not reoffend, as do her acceptance of responsibility, extreme remorse, and efforts to make amends. Moreover, she has chosen not to renew her license to practice social work and is no longer involved in any way in billing Medicaid.

For the same reasons, specific deterrence is not an issue either. By just about every metric for recidivism kept by the U.S. Sentencing Commission, Nita is in the category of "least likely to reoffend:"

---

[8] Nita is responsible under the Guidelines for the entire loss amount by virtue of the fact that Partners was not adequately supervised by an LISW (Iannone). However, for a significant portion of the billing, if Partners had been adequately supervised, they could have properly billed Medicaid for group psychotherapy. The loss amount is the entire amount of the billings and does not afford any credit for the fact that some amount of money could have been legally billed but for the lack of supervision. We respectfully submit that, while the loss amount is appropriately calculated under the Guidelines, these kinds of unreasonable positions are exactly why courts, including the Sixth Circuit, have determined that variances are "particularly appropriate" in loss-driven cases like this one. *See Musgrave*, 647 F. App'x at 538.

- Offenders whose offenses involved fraud[9] are least likely to reoffend.

- Offenders over 60 years old are least likely to reoffend.

- Female offenders are least likely to reoffend.

- College graduates are least likely to reoffend.

- Offenders with zero criminal history points are least likely to reoffend.[10]

*See* U.S. Sent'g Comm'n, Recidivism Among Federal Offenders: A Comprehensive Overview 18, 20, 23, 24 (March 2016), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf [http://bit.ly/fedrecidivism].

Moreover, specific deterrence has already been accomplished by the fact of her conviction and the loss of her professional license. At 66 years old, Nita has lost her career and has faced public embarrassment, shame, and humiliation as her aberrant error in judgment has been announced for all to hear. She will live with the blot of a felony conviction for the rest of her life, with all the attendant collateral consequences. She will also be paying restitution for years.

General deterrence in this case is also satisfied by a probationary sentence. As an initial matter, federal probation is no mere "slap on the wrist." *See Gall v. United States*, 552 U.S. 38, 48–49, 48 n.4 (2007) (recognizing that although custodial sentences are qualitatively more severe than probationary sentences of equivalent terms, probationers are nonetheless subject to conditions that "substantially restrict their liberty.") Probationers may not leave the judicial district, move, or change jobs without notifying, and in some

---

[9] Interestingly, although the Guidelines here recommend incarceration by virtue of the offense level (17), the Sentencing Commission found that there "is not a strong correspondence between final offense level and recidivism." U.S. Sent'g Comm'n, Recidivism Among Federal Offenders: A Comprehensive Overview at 20. Those in the lowest offense levels (1–8) had almost the same re-arrest rate as those at the highest levels (31–43). *Id.* On the other hand, criminal-history points—of which Nita has none—were found to have a very strong correlation to recidivism. *Id.* at 18.

[10] Indeed, although Nita will never commit another crime no matter what the sentence in this case is, the data suggests that incarcerating individuals like Nita may actually *increase* the risk that they reoffend. *See id.* at 22 (finding that offenders sentenced to probation are less likely to reoffend than individuals sent to prison, and among those sent to prison, those with shorter lengths of imprisonment generally had lower recidivism rates).

cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from possessing firearms. U.S.S.G. §5B1.3. Most probationers are also subject to individual "special conditions" imposed by the court. U.S. Probation and Pretrial Services has recommended, for example, that Nita be required to refrain from incurring new credit charges or opening additional lines of credit without permission and to undergo mental-health assessments and treatment. These are not restrictions to be taken lightly. *See id.* at 48 n.4 ("[T]he probation or parole conditions imposed on an individual can have a significant impact on both that person and society . . . . Often these conditions comprehensively regulate significant facets of their day-to-day lives . . . . They may become subject to frequent searches by government officials, as well as to mandatory counseling sessions with a caseworker or psychotherapist") (citing 1 N. COHEN, THE LAW OF PROBATION AND PAROLE § 7:9 (2d ed. 1999)). Nita may also be subject to other conditions as the Court, in its judgment, sees fit, potentially including things like community service, location monitoring, or house arrest.

In addition to monitoring and restrictions on liberty that a probationary sentence would involve, Nita has also been subject to the following punishments:

- The loss of her social-work license and career (at an age where she will not be able to start over);

- Significant monetary restitution; and

- The permanent blot of a felony, with all its attendant collateral consequences.

Educational and vocational training is not relevant in this case and, as discussed above, it would be far more efficient for Nita to receive needed medical care in the community while on probation. It would also be more efficient for the criminal-justice sanction to be probation. According to the probation office, it costs taxpayers an average $37,448 per year to house an inmate in the BOP. (PSR, Sealed Doc. 42, ¶ 76, PageID# 170.) That number is likely much higher for someone like Nita who is elderly and requires

intensive medical attention. Supervision at a halfway house is not much better at $34,493. (*Id.*) Comparatively, probation supervision costs only $4,472 a year.

Probation not only saves the taxpayers almost $3,000 every month ($33,000 a year), but it also serves to help alleviate other societal costs associated with imprisonment, including prison overcrowding. The BOP's inmate population increased 700% between 1980 and 2016, and the rising costs associated with that jump have—according to the DOJ itself—threatened the DOJ's ability to meet its other missions, including maintaining national security. U.S. GOVERNMENT ACCOUNTABILITY OFFICE, BETTER PLANNING AND EVALUATION NEEDED TO UNDERSTAND AND CONTROL RISING INMATE HEALTH CARE COSTS, P. 1 (June 2016), https://www.gao.gov/assets/680/677983.pdf [bit.ly/BOPovercrowded]. The problem is so severe that the BOP itself has been increasing its use of prison alternatives, like home confinement, for low-risk inmates like Nita. *Id.* at Executive Summary ("For low-risk and low-need inmates, home confinement is the preferred alternative according to BOP and BOP increased its use by 67 percent for minimum security inmates and 58 percent for low security inmates from fiscal years 2009 through 2015.") Congress and law-enforcement officers have also recently sought to curb these costs by transitioning certain elderly offenders out of prison and into home confinement through the First Step Act. *See* U.S. DEP'T JUSTICE, BUREAU OF PRISONS, *Home Confinement under the First Step Act* (Apr. 4, 2019), https://www.bop.gov/policy/om/001-2019.pdf [http://bit.ly/2LJxIc6]. Nita would meet all of the criteria of an elderly offender eligible for home confinement under this First Step Act pilot program, except of course the requirement of having served two-thirds of a sentence.[11] *See id.*, p. 3.

Moreover, the Government itself has concluded that the BOP's facilities and programs are not implemented effectively, especially for inmates over 50 years old. *See, e.g.*,

---

[11] She is (1) older than 60 years old; (2) serving a term less than life for a nonviolent offense; (3) has not been convicted of a violent offense or sex offense; (4) has no history of violence; (5) has not attempted escape; and (6) presents no substantial risk of further criminal conduct; and (7) home confinement would result in a substantial net reduction of costs to the Federal Government.

U.S. Dep't Justice, Ofc. Inspector General, Audit Division, The Impact of an Aging Inmate Population on the Federal Bureau of Prisons (2015), https://oig.justice.gov/reports/2015/e1505.pdf [http://bit.ly/BOPaging]. The DOJ specifically found that (1) limited staff and inadequate training affect the BOP's ability to address the needs of aging inmates; (2) the physical infrastructure of BOP institutions limits the availability of appropriate housing for aging inmates ("[a]ging inmates with limited mobility also encounter difficulties navigating institutions without elevators and with narrow sidewalks or uneven terrain"); and (3) the BOP does not provide programming opportunities designed specifically to meet the needs of aging inmates. *Id.* at pp. ii–iii.

These efforts and findings by Congress and the Department of Justice show that it is actually more effective and efficient to provide correctional treatment *outside* of prison for people like Nita. Therefore, probation is appropriate under 18 U.S.C. § 3553(a)(2)(D), perhaps with a period of home confinement or other conditions as the Court deems appropriate.

A sentence of probation would not create unwarranted sentence disparities, while a sentence of imprisonment would do so. *See* 18 U.S.C. § 3553(a)(6). Around 30% of *all* white-collar defendants receive no prison time in the Sixth Circuit, a percentage likely driven down by those with loss amounts far exceeding the amount in this case. *See Musgrave*, 647 F. App'x at 538–39 (noting that nearly 30% of all white-collar defendants receive no jail time, with around 10% of all white-collar defendants receiving some period of home confinement instead, but noting that 90% of defendants in cases involving losses between $1 million and $2.5 million receive jail time). Indeed, this Honorable Court has often sentenced defendants to probation who, like Nita, are at a Guidelines offense level 17, or even higher. *United States v. Rosenfield*, Case No. 1:14-cr-34 (Title 26 tax offense, level 17, sentenced to 5 years' probation); *United States v. Fritz*, Case No. 1:14-cr-00447 (Health Care Fraud, level 26, sentenced to 5 years' probation); *United States v. Nickels*, Case No. 1:14-cr-447 (Health Care Fraud, level 18, sentenced to 5 years' probation);

*United States v. Patterson*, Case No. 4:17-cr-328 (Wire Fraud/Money Laundering, level 22, Criminal History Category II, sentenced to 5 years' probation).

A probationary sentence would therefore not be much of an outlier at all, and any minor disparity that does exist is easily justified by the unique circumstances of the offense conduct and the history and characteristics of the defendant. On the other hand, what would be very difficult to justify would be sending Nita to prison, on top of requiring her and only her to pay back the full amount of restitution, while two other equally culpable individuals—Carol and Sally—receive no punishment at all. *See United States v. Demers*, 842 F.3d 8, 15 (1st Cir. 2016) (holding that a defendant is not entitled to a reduced sentence simply because his codefendants received one, but noting that "[s]till, legitimate concerns may arise if similarly situated coconspirators or codefendants receive inexplicably disparate sentences.") It was not the Court's decision whom to charge in this case, of course, but we respectfully submit that the Government's decision, if it led to imprisonment for Nita, would create unwarranted sentence disparities and would promote disrespect for the law and erode confidence in our law-enforcement and justice systems.

## CONCLUSION

Nita has lived a life of modesty, not extravagance. Her personality is characterized by compassion, not greed. She has cultivated strong ties to the community, including developing long-lasting friendships and healthy family relationships. She actively contributes to all those relationships, nurturing others and helping them with challenging circumstances. Removing Nita from the community would not only negatively affect her; it would have a negative impact all who know her and benefit from her being in their lives. Nita committed this offense to allow her fledgling business to continue providing helpful, virtuous services to underserved women and children. This was a terrible error in judgment, yes. But it does not call for imprisonment. This is Nita's first and only run-in with the law in sixty-six years and she has done her best to make her mistakes right by accepting responsibility and paying significant restitution. A sentence of probation, with conditions

as the Court sees fit, is sufficient to accomplish the goals of sentencing, especially when Nita has already suffered tremendously in terms of mental anguish, embarrassment, and the loss of her lifelong career. Any period of imprisonment would be greater than necessary. Therefore, we respectfully request that the Court sentence Nita to a term of probation, with the conditions requested by the probation department and any additional conditions the Court in its judgment sees fit.

Respectfully submitted,

/s/ *Paul M. Flannery*
Paul M. Flannery (OH: 0091480)
Chris N. Georgalis (OH: 0079433)
Kevin J. Vogel (OH: 0097053)

*Attorneys for Defendant Arnita Leff*

FLANNERY | GEORGALIS, LLC
1375 E. 9th St., 30th Floor
Cleveland, OH 44114
(216) 367-2094 (Paul)
(216) 367-2095 (Chris)
(216) 367-2120 x.104 (Kevin)
paul@flannerygeorgalis.com
chris@flannerygeorgalis.com
kvogel@flannerygeorgalis.com

# EXHIBIT INDEX

| CHARACTER LETTERS | |
|---|---|
| Alexandra Leff | Exhibit A – Pages 1–2 |
| Danielle Leff | Exhibit A – Page 3 |
| Darrell A. Young | Exhibit A – Pages 4–5 |
| Karen Meyer | Exhibit A – Pages 6–7 |
| Kevin D. Cowan | Exhibit A – Pages 8–12 |
| Robert H. Cowan | Exhibit A – Page 13 |
| Donna Shafran | Exhibit A – Page 14 |
| Ellen K. Young | Exhibit A – Page 15 |
| Helene Kravitz | Exhibit A – Page 16 |
| Judith Stern Waxman | Exhibit A – Page 17 |
| Nancy A. Levine | Exhibit A – Pages 18–19 |
| Rhonda Kruman | Exhibit A – Page 20 |
| Deborah L. Ross, Ph.D. | Exhibit A – Page 21 |
| Mark McConville, Ph.D. | Exhibit A – Page 22 |
| Gary and Deborah Morse | Exhibit A – Page 23 |
| Gina Tyhulski | Exhibit A – Pages 24–26 |
| Leah Dicker (Affidavit) | Exhibit A – Pages 27–28 |
| Marcia Hudgel | Exhibit A – Page 29 |
| Sha'Ran Marshall | Exhibit A – Pages 30–31 |
| Sheree Herrmann | Exhibit A – Pages 32–33 |
| **TAX RETURNS** | |
| 2014 Tax Return | Exhibit B – Pages 1–5 |
| 2015 Tax Return | Exhibit B – Pages 6–14 |
| 2016 Tax Return | Exhibit B – Pages 15–21 |
| 2017 Tax Return | Exhibit B – Pages 22–26 |

## CERTIFICATE OF SERVICE

I hereby certify that on October 9, 2019, a copy of the foregoing was filed electroni-cally. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. A copy was also emailed to Officer Christopher Woo, U.S. Probation & Pretrial Services, at Christopher_Woo@ohnp.uscourts.gov. Parties may access this filing through the Court's system.

/s/ *Paul M. Flannery*

Paul M. Flannery

*Attorney for Defendant Arnita Leff*